**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERTHA SAUNDERS,<br><br>                Plaintiff,<br><br>    vs.<br><br>EXPERIAN INFORMATION SOLUTIONS,<br>INC.,<br><br>              Defendant. | Civil Case No.: 1:25-cv-01839<br><br>**COMPLAINT AND DEMAND<br>FOR JURY TRIAL** |

Plaintiff Robertha Saunders ("Plaintiff" or "Ms. Saunders") brings this action on an individual basis, against Defendant Experian Information Solutions, Inc. ("Defendant" or "Experian") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendant's mixing Plaintiff's credit file with another consumer.

## INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage,

both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.    These CRAs sell information to readily paying subscribers (*i.e.*, retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.    "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.    Congress made the following findings when it enacted the FCRA in 1970:

    a.    The banking system is dependent upon fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential

to the continued functioning of the banking system.

    b.    An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

    c.    Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

    d.    There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1)-(4).

8.    Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."   15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally *ruin his reputation without cause*, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name *without his knowledge and without reason*.

> Shakespeare said, the loss of one's good name is beyond price and
> makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)]
(emphasis added).

10.    Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15
U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize
reasonable procedures "to assure the maximum possible accuracy" of the personal and financial
information that they compile and sell about individual consumers.

11.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine
whether information disputed by consumers is inaccurate and record the current status of the
disputed information, or delete the disputed information, before the end of the 30-day period
beginning on the date on which the CRA receives the notice of dispute from the consumer. This
mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate
information contained within a consumer's credit report is corrected and/or deleted so as to not
prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.    In light of these important findings and purposes, Congress specifically noted "a
need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and
respect for the consumer's right to privacy." 15 U. S.C. § 1681(a)(4).

13.    The FCRA also requires furnishers of information, a creditor or other third party
that provides information about consumer to a CRA, upon notice, to conduct a reasonable
reinvestigation of all disputes with regard to the completeness or accuracy of any information it
provides to the CRAs regarding a consumer and modify, delete, or permanently block any items
of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is
completed.

14.     A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.     "Mixed files" create a false description and representation of a consumer's credit history.

17.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.     Mixed files are not a new phenomenon. Defendant has been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.     More recently, Defendant has been the subject of numerous state attorney general actions relating to its mixed file problem.

20.     For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

_____

[1]     https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

21.     Notwithstanding Defendant's notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.  This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other.

23.     Defendant has been sued thousands of times wherein an allegation was made that Defendant violated the FCRA. Moreover, Defendant is sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendant mixed a consumer's credit file with that of another consumer.

24.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes.  The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages.  Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

26.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the

FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

27.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

28.     More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

29.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on

"reckless disregard for a statutory duty").

30.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31.     Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Defendant, to review their procedures when a mixed file occurs.

32.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33.     Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein Defendant published in a consumer report about Plaintiff the information of another consumer because Defendant mixed Plaintiff's credit file with that of an unrelated consumer.

34.     Further, Plaintiff's claims also arise out of Defendant's blatantly inaccurate credit reporting, wherein Defendant permitted the impermissible access to Plaintiff's credit file when it published a consumer report about Plaintiff in response to a credit application submitted by and pertaining to an unrelated consumer because Defendant mixed Plaintiff's credit file with that of an unrelated consumer.

35.     Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of a mixed file, and for failing to delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i; and for selling Plaintiff's credit report to third parties, whom did

not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer, in violation of the FCRA, 15 U.S.C. § 1681b(a).

36.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, as described herein.

**PARTIES**

37.     Robertha Saunders ("Plaintiff" or "Ms. Saunders") is a natural person residing in Brooklyn, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

38.     Defendant Experian Information Solutions, Inc. ("Defendant" or "Experian") is a corporation with a principal place of business located at 701 Experian Pkwy, Allen, Texas 75013, and is authorized to do business in the State of New York, including within this District.

39.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

40.     The information Experian collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans.  Experian also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

41.     Experian collects and maintains such information about consumers, whether consumers like it or not. Consumers do not have a choice as to whether Experian collects and maintains information about them.  Not only that, but consumers cannot remove information that

Experian collects and maintains about them from the Experian database. Further, Experian sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Experian sold.

## JURISDICTION AND VENUE

42.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

43.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

44.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

45.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. 15 U.S.C. § 1681(a).

46.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

47.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

48.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## DEFENDANT'S PROCESSING OF CREDIT INFORMATION

49.    Defendant regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

50.    These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

51.    Defendant collects information from thousands of furnishers.

52.    The process by which Defendant receives, sorts, and stores information is largely electronic.

53.    Furnishers report credit information to Defendant through the use of coded tapes that are transmitted to Defendant on a monthly basis through software known as Metro 2.

54.    Defendant takes credit information reported by furnishers and creates consumer credit files.

55.    Defendant maintains credit files on more than 200 million consumers.

56.    Credit files are updated electronically by the furnishers to reflect new information

regarding the reported accounts (sometimes referred to within the industry as "tradelines").

A.    **Defendant's Mixed File Problem**

57.    Defendant knows that different consumers have similar names.

58.    Defendant knows that different consumers can have similar Social Security numbers.

59.    Defendant knows that different consumers with similar names can also have similar Social Security numbers.

60.    Defendant knows that public records often do contain identifying information such as Social Security numbers or dates of birth.

61.    Defendant matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

62.    Defendant accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

63.    From time to time, Defendant's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

64.    Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendant, regarding its significant failures and deficiencies with respect to mixed files.

65.    Despite Defendant's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendant containing information

belonging to another consumer.

66.     A mixed or merged credit file is the result of Defendant's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

67.     There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendant to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

68.     The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendant.

69.     A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendant.

70.     Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

71.     Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

## FACTUAL ALLEGATIONS

**A.     Plaintiff Applies for an Auto Loan with Municipal Credit Union**

72.     Plaintiff has been driving the same car since 2012. Plaintiff purchased her vehicle with an auto loan through non-party Municipal Credit Union ("Municipal"), had never missed a payment, and paid off her auto loan back in 2019.

73.     As much as she valued her car, it was over 10 years old, had various mechanical issues, and was embarrassingly loud. It would have cost Plaintiff more to repair the vehicle than to simply purchase a new car.

74.     Accordingly, Plaintiff decided she would apply for an auto loan with Municipal to finance the purchase of her new car.

75.     On or around August 16, 2024, Plaintiff completed and submitted an application for an auto loan with Municipal to finance the purchase of her new car. Plaintiff did not expect any challenges in securing the auto loan, because she had previously secured auto loans with Municipal and paid those loans in a timely manner, without issue.

76.     For Municipal to make a determination regarding Plaintiff's auto loan application, it would need to obtain copies of her consumer files from Defendant Experian. Plaintiff provided Municipal with her personal identification information, including her Social Security number, and authorized it to obtain copies of her consumer files.

77.     On August 16, 2024, Defendant sold a consumer report about Plaintiff to Municipal in response to Plaintiff's application for an auto loan.

**B.    Municipal Denies Plaintiff's Application for an Auto Loan**

78.     On or about August 19, 2024, Municipal issued an adverse action notice to Plaintiff. Within that letter, Municipal communicated that it had denied Plaintiff's loan application due to information reported by Defendant.

79.     Specifically, Municipal's adverse action notice provided the following reason for denying Plaintiff's credit application: "Delinquent past or present credit obligations with others, Excessive obligations in relation to income."

80.     The adverse action notice further provided that key factors that adversely affected

Plaintiff's credit score included: "SEROUS DELINQUENCY, PUBLIC RECORD, OR COLLECTION FILED" and "NUMBER OF ACCOUNTS WITH DELINQUENCY."

81.     Defendant's reporting was grossly inaccurate: Plaintiff had never been delinquent on any of her credit obligations nor had Plaintiff ever had an account in collections, or a bankruptcy.

82.     Plaintiff was shocked and dismayed at the auto loan denial because Plaintiff had been diligently working towards being a responsible credit user and had been very careful to avoid adverse credit actions.

83.     The credit file provided to Municipal by Defendant Experian was patently false on its face because Defendant should not have sold a credit report about Plaintiff that included credit information that Plaintiff had been delinquent on any credit obligations.

84.     It was inaccurate for Defendant to publish information to a third party indicating that Plaintiff was ever delinquent on any credit obligations or accounts sent to collections when Plaintiff had never been delinquent nor did she have any accounts sent to collections, nor did she ever file for bankruptcy.

85.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**C.     Plaintiff's Mixed File Problem in September 2024**

86.     Shocked, worried, and confused, Plaintiff immediately requested a copy of her credit file from Defendant.

87.     On or about September 2, 2024, Plaintiff secured a copy of her consumer file from Defendant.

88.     Upon reviewing the contents of the September 2, 2024, consumer file, Plaintiff discovered, to her utter surprise and dismay, over 40 separate entries in her consumer report that did not belong to her.

89.     Further, and more damaging to Plaintiff, Plaintiff discovered at least four accounts that were past due or in collections that did not belong to her.

90.     Plaintiff was confused by the appearance of copious amounts of credit information that did not belong to Plaintiff at all.

91.     Specifically, Defendant was reporting the following name variations that do not belong to Plaintiff: Robert Saunders, and Saunders Robert

92.     Defendant was reporting the following addressed that do not belong to Plaintiff:

    a.     133 Rockaway Ave Apt 2A, Brooklyn NY, 11233-2714
    b.     2678 Linden Blvd Apt 3C, Brooklyn NY, 11208-4636
    c.     133 Rockaway Ave Apt 2, Brooklyn NY, 11233-6028
    d.     133 Rockaway Ave Apt 3A, Brooklyn NY,11233-2714
    e.     2678 Linden Blvd Apt 6, Brooklyn NY,11208-4667

93.     Further, Defendant was also reporting the following Social Security Number variation that does not belong to Plaintiff: xxx-xx-4396

94.     Defendant was reporting the following phone numbers that do not belong to Plaintiff: (347) 406-8267 and (347) 666-4588

95.     Defendant was reporting the following employers at which Plaintiff had never been employed:

    a.     Self-employed
    b.     NYC Housing
    c.     Paradise Trans
    d.     Terminix

96.     Defendant was reporting the following 15 accounts (!) that did not belong to Plaintiff:

a.      Capital One
        Account Number: 515676XXXXXXXXXX
        Opened: 3/17/2024
        Balance: $210
        Status: Open/Never late

b.      Capital One
        Account Number: 517805XXXXXXXXXX
        Opened: 08/04/2021
        Balance: $287
        Status: Open
        **Delinquent**: Past due 30 days in Oct. 2021, March 2022, Sept. 2022; Past
        due 60 days in Oct. 2022; Past due 90 days in Nov. 2022; Past due 120
        days in Dec. 2022; Past due 150 days in Jan. 2023

c.      Capital One
        Account Number 517805XXXXXXXXXX
        Opened: 03/13/2021
        Balance: $214
        Status: Open
        **Delinquent**: Past due 30 days in Feb. 2022, Sept. 2022, Jan. 2023, and
        Sept. 2023; Past due 60 days in Feb. 2022, Oct. 2022, and Oct. 2023

d.      Capital One Auto Finance
        Account Number 620102XXXXXXXXXX
        Opened: 09/22/2022
        Status: Paid, Closed/Never late

e.      Credit Collection Services
        Account Number 996952XX
        Original Creditor: Progressive
        Opened: 08/25/2022
        Balance: $149
        **Status: Collection account**. $149 past due as of Aug 2024

        Payment history guide: Collection as of Aug 2024, Aug 2024, Aug 2024,
        Jul 2024, Jul 2024, Jul 2024, Jun 2024, Jun 2024, Jun 2024, May 2024,
        May 2024, May 2024, Apr 2024, Apr 2024, Apr 2024, Mar 2024, Mar
        2024, Mar 2024, Mar 2024, Feb 2024, Feb 2024, Feb 2024, Feb 2024, Jan
        2024, Jan 2024, Dec 2023, Dec 2023, Dec 2023, Dec 2023, Nov 2023,
        Nov 2023, Nov 2023, Oct 2023, Oct 2023, Oct 2023, Oct 2023, Oct 2023,
        Sep 2023, Sep 2023, Sep 2023, Aug 2023, Aug 2023, Aug 2023, Jul 2023,
        Jul 2023, Jul 2023, Jul 2023, Jun 2023, Jun 2023, Jun 2023, Jun 2023,
        May 2023, May 2023, Apr 2023, Apr 2023, Mar 2023, Mar 2023, Mar
        2023, Mar 2023, Feb 2023, Feb 2023, Feb 2023, Jan 2023, Jan 2023, Jan

2023, Dec 2022, Dec 2022, Dec 2022, Dec 2022, Nov 2022, Nov 2022, Nov 2022

f.   Credit Karma CB/CRB
     Account Number 4XWXXXX
     Opened: 07/16/2024
     Balance: $0
     Status: Open/Never late

g.   Credit One Bank
     Account Number 444796XXXXXXXXXX
     Opened: 07/16/2024
     Balance: $292
     Status: Open/Never late

h.   Credit One Bank
     Account Number 444796XXXXXXXXX
     Opened: 08/31/2022
     Status: Paid, Closed
     **Delinquent**: Past due 30 days in Sept. 2023; Past due 60 days in Oct.
     2023; Past due 90 day sin Nov. 2023; and Past due 120 days in Dec. 2023

i.   Evergreen/ Freedom Road
     Account Number 201811XXXXXXXX
     Opened: 10/23/2018
     Balance: -
     Status: **Discharged through bankruptcy Chapter 7**
     Late payments prior to bankruptcy
     Payment History Guide: 90 days past due as of Nov 2019
     60 days past due as of Jul 2020, Jun 2020, Oct 2019, Aug 2019, Jul 2019
     30 days past due as of May 2020, Jan 2020, Sep 2019, Jun 2019, May
     2019

j.   Fetti Fingerhut/Webbank
     Account Number 636992XXXXXXXXXX
     Opened: 04/12/2022
     Balance: -
     Status: Paid, Closed/Never late.

k.   First INV Servicing Corp
     Account Number 500001XXXXXXXXXXX
     Opened: 02/14/2024
     Balance: $28,766
     Status: Open/Never late.

l.      Kovo INC
        Account Number GB7550XXXXXXX
        Opened: 02/27/2024
        Balance: $108
        Status: Open/Never late

m.      TBOM/ATLS/ASPIRE
        Account Number 550114XXXXXXXXXX
        Opened: 09/10/2023
        Balance: $657
        Status: Open/Never late.

n.      Webbank Fingerhut
        Account Number 636992XXXXXXXXXX
        Opened: 07/04/2021
        Balance: -
        Status: Paid, Closed/Never late

97.     In the public record section, Defendant reported that Plaintiff filed for Chapter 7 bankruptcy in August 28, 2020, that was resolved in December 2020.

98.     By reporting the above credit accounts, public record information, and other personal information in the consumer file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

99.     Defendant was reporting the following 15 hard inquiries which did not belong to Plaintiff:

            a.      Cap One NA inquired on 03/17/2024, 03/05/2023
            b.      NCCINC/South Shore Nissa inquired on 09/21/2023, 09/22/2022
            c.      Ally Financial inquired twice on 09/22/2022
            d.      Cap One Auto Fin Via Dealer inquired on 09/22/2022
            e.      Consumer Portolio Services inquired on 09/22/2022
            f.      Fis/Associate D Bank, NA inquired on 09/22/2022
            g.      Global Lending Services inquired on 09/22/2022
            h.      Nissan Motor Acceptance inquired on 09/22/2022
            i.      Santander Consumer USA inquired on 09/22/2022
            j.      Municipal Credit Union inquired on 09/07/2022

19

k.    Nccinc/Axis Motor Cars 2 inquired on 09/05/2022
l.    Credit One Bank inquired on 08/23/2022

100.    Plaintiff did not apply for credit with, nor did Plaintiff have an active credit relationship with any of these entities. Defendant did not have a permissible purpose for furnishing information about Plaintiff to the above-referenced entities on the above-referenced dates.

101.    Upon information and belief, all 15 of the above-referenced inquiries were initiated by credit applications submitted by an unrelated consumer.

102.    As Plaintiff had not authorized any of the above-referenced entities to request Plaintiff's credit report from Defendant on the above-referenced dates in 2022, 2023, or 2024, nor did Plaintiff enter into any business transaction or relationship which otherwise may have provided a basis for those entities securing a copy of Plaintiff's consumer report from Defendant, Defendant disclosed information about Plaintiff to these entities without a permissible purpose and in violation of 15 U.S.C. § 1681b(a).

**D.    Plaintiff's September 2, 2024, Dispute to Defendant Experian**

103.    On or about September 2, 2024, worried that something was very wrong with her consumer file, Plaintiff disputed the inaccuracies. Specifically, Plaintiff disputed the numerous items of information that were in her Experian consumer file but that did not belong to her. Plaintiff disputed the inaccuracies with Defendant online and then via telephone.

104.    Upon information and belief, Plaintiff specifically disputed the credit accounts, public record, and personal information that Defendant Experian was inaccurately reporting about Plaintiff.

105.    In or around September 3, 2024, Plaintiff spoke with a representative of Defendant on the phone and explained that there were numerous pieces of information in Plaintiff's Experian consumer report that did not belong to Plaintiff. Upon information and belief, Plaintiff explained

to Defendant's representative that Experian mixed her information with that of her twin brother Robert Saunder's information.

106.    Upon information and belief, the representative was able to find Plaintiff's report and confirmed that the representative could see that Experian had mixed Plaintiff's and her brother's consumer information.

107.    Upon information and belief, Plaintiff requested that Defendant reinvestigate the disputed information, correct the reporting, and send her a corrected copy of her consumer report.

**E.    Defendant Experian's Method for Considering Consumer Disputes**

108.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

109.    The credit bureaus, Defendant Experian, and non-parties Equifax, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

110.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

111.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

112.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

113.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

114.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

115.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

116.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

117.    The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

118.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**F.    Defendant's Unreasonable Dispute Reinvestigation**

119.    In or around September 2, 2024, in response to Plaintiff's online dispute, Defendant Experian deleted only the disputed addresses.

120.    Upon information and belief, Plaintiff never received a response from Defendant Experian concerning the results of its reinvestigation of the credit accounts, public record, and

other personal information in Plaintiff's dispute.

121.    Upon information and belief, Defendant did not conduct a reasonable reinvestigation of Plaintiff's phone dispute, which phone call lasted over 50 minutes.

122.    Upon information and belief, Defendant did not conduct a reasonable reinvestigation of Plaintiff's online dispute.

123.    Upon information and belief, Defendant failed to conduct a reasonable investigation of Plaintiff's September 2024 phone dispute or online dispute, or any bona-fide reinvestigation whatsoever, to determine whether the disputed information was inaccurate and remove the inaccurate information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

124.    Thereafter, and upon information and belief, Defendant failed to unmix Plaintiff's credit file from that of the other consumer and Defendant continued to report Plaintiff's brother's information to Plaintiff's consumer file.

**G.    Plaintiff's Mixed Credit File as of October 2024**

125.    Concerned about the state of her consumer file and Defendant's lack of response, Plaintiff decided to request another copy of her consumer file from Defendant.

126.    On or about October 7, 2024, Plaintiff secured a copy of her consumer file from Defendant.

127.    Upon reviewing the contents of the October 7, 2024, consumer file, Plaintiff was distressed to see that Defendant was still reporting the information of her brother to Plaintiff's consumer file.

128.    Defendant was still reporting the accounts and information that Plaintiff disputed, but with an added annotation of "disputed by consumer."

129.    Upon receipt of Plaintiff's September 2024 dispute, Defendant was required to send

a dispute notice, including but not limited to an ACDV, to the furnishers regarding the credit accounts disputed by Plaintiff.

130. Upon receipt of Plaintiff's September 2024 dispute, Defendant was required to send a dispute notice, including but not limited to an ACDV, to the furnishers of the following credit accounts disputed by Plaintiff:

    a.    Capital One
         Account Number: 515676XXXXXXXXXX
         Opened: 3/17/2024
         Balance: $210
         Status: Open/Never late

    b.    Capital One
         Account Number: 517805XXXXXXXXXX
         Opened: 08/04/2021
         Balance: $287
         Status: Open
         Delinquent: Past due 30 days in Oct. 2021, March 2022, Sept. 2022; Past due 60 days in Oct. 2022; Past due 90 days in Nov. 2022; Past due 120 days in Dec. 2022; Past due 150 days in Jan. 2023

    c.    Capital One
         Account Number 517805XXXXXXXXXX
         Opened: 03/13/2021
         Balance: $214
         Status: Open
         Delinquent: Past due 30 days in Feb. 2022, Sept. 2022, Jan. 2023, and Sept. 2023; Past due 60 days in Feb. 2022, Oct. 2022, and Oct. 2023

    d.    Capital One Auto Finance
         Account Number 620102XXXXXXXXXX
         Opened: 09/22/2022
         Status: Paid, Closed/Never late

    e.    Credit Collection Services
         Account Number 996952XX
         Original Creditor: Progressive
         Opened: 08/25/2022
         Balance: $149
         Status: Collection account. $149 past due as of Aug 2024

Payment history guide: Collection as of Aug 2024, Aug 2024, Aug 2024, Jul 2024, Jul 2024, Jul 2024, Jun 2024, Jun 2024, May 2024, May 2024, May 2024, Apr 2024, Apr 2024, Apr 2024, Mar 2024, Mar 2024, Mar 2024, Mar 2024, Feb 2024, Feb 2024, Feb 2024, Feb 2024, Jan 2024, Jan 2024, Dec 2023, Dec 2023, Dec 2023, Dec 2023, Nov 2023, Nov 2023, Nov 2023, Oct 2023, Oct 2023, Oct 2023, Oct 2023, Sep 2023, Sep 2023, Sep 2023, Aug 2023, Aug 2023, Aug 2023, Jul 2023, Jul 2023, Jul 2023, Jul 2023, Jun 2023, Jun 2023, Jun 2023, Jun 2023, May 2023, May 2023, Apr 2023, Apr 2023, Mar 2023, Mar 2023, Mar 2023, Mar 2023, Feb 2023, Feb 2023, Feb 2023, Jan 2023, Jan 2023, Jan 2023, Dec 2022, Dec 2022, Dec 2022, Dec 2022, Nov 2022, Nov 2022, Nov 2022

f.   Credit Karma CB/CRB
     Account Number 4XWXXXX
     Opened: 07/16/2024
     Balance: $0
     Status: Open/Never late

g.   Credit One Bank
     Account Number 444796XXXXXXXXXX
     Opened: 07/16/2024
     Balance: $292
     Status: Open/Never late

h.   Credit One Bank
     Account Number 444796XXXXXXXXXX
     Opened: 08/31/2022
     Status: Paid, Closed
     Delinquent: Past due 30 days in Sept. 2023; Past due 60 days in Oct. 2023; Past due 90 day sin Nov. 2023; and Past due 120 days in Dec. 2023

i.   Evergreen/ Freedom Road
     Account Number 201811XXXXXXXX
     Opened: 10/23/2018
     Balance: -
     Status: Discharged through bankruptcy Chapter 7
     Late payments prior to bankruptcy
     Payment History Guide: 90 days past due as of Nov 2019
     60 days past due as of Jul 2020, Jun 2020, Oct 2019, Aug 2019, Jul 2019
     30 days past due as of May 2020, Jan 2020, Sep 2019, Jun 2019, May 2019

j.   Fetti Fingerhut/Webbank
     Account Number 636992XXXXXXXXXX
     Opened: 04/12/2022

                Balance: -
                Status: Paid, Closed/Never late.

k.     First INV Servicing Corp
         Account Number 500001XXXXXXXXXXX
         Opened: 02/14/2024
         Balance: $28,766
         Status: Open/Never late.

l.     Kovo INC
         Account Number GB7550XXXXXXX
         Opened: 02/27/2024
         Balance: $108
         Status: Open/Never late

m.     TBOM/ATLS/ASPIRE
         Account Number 550114XXXXXXXXXX
         Opened: 09/10/2023
         Balance: $657
         Status: Open/Never late.

n.     Webbank Fingerhut
         Account Number 636992XXXXXXXXXX
         Opened: 07/04/2021
         Balance: -
         Status: Paid, Closed/Never late

131.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to Capital One regarding Account Number 515676XXXXXXXXXX, or Capital One verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

132.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to Capital One regarding Account Number 517805XXXXXXXXXX, opened in 08/04/2021, or Capital One verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

133.    Defendant either failed to send a dispute notice, including but not limited to an

ACDV, to Capital One regarding Account Number 517805XXXXXXXXXX, opened in 03/13/2021, or Capital One verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

134.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to Capital One Auto Finance regarding Account Number 620102XXXXXXXXXXX, or Capital One Auto Finance verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

135.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to Credit Collection Services regarding Account Number 996952XX, or Credit Collection Services verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

136.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to Credit Karma CB/CRB regarding Account Number 4XWXXXX, or Credit Karma CB/CRB verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

137.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to Credit One Bank regarding Account Number 444796XXXXXXXXXX opened in 07/16/2024, or Credit One Bank verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

138.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to Credit One Bank regarding Account Number 444796XXXXXXXXXX opened in

08/31/2024, or Credit One Bank verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

139.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to Evergreen/ Freedom Road regarding Account Number 201811XXXXXXXXX, or Evergreen/ Freedom Road verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

140.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to Fetti Fingerhut/Webbank regarding Account Number 636992XXXXXXXXXX, or Fetti Fingerhut/Webbank verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

141.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to First INV Servicing Corp regarding Account Number 500001XXXXXXXXXXX, or First INV Servicing Corp verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

142.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to Kovo INC regarding Account Number GB7550XXXXXXXX, or Kovo INC verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

143.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to TBOM/ATLS/ASPIRE regarding Account Number 550114XXXXXXXXXX, or TBOM/ATLS/ASPIRE verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

144.    Defendant either failed to send a dispute notice, including but not limited to an ACDV, to Webbank Fingerhut regarding Account Number 636992XXXXXXXXXX, or Webbank Fingerhut verified to Defendant that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's consumer report and/or in Plaintiff's consumer file.

145.    In response to Plaintiff's September 2024 dispute, Defendant deleted addresses disputed by Plaintiff.

146.    In response to Plaintiff's September 2024 dispute, however, Defendant failed to delete the names, telephone numbers, and SSN disputed by Plaintiff.

147.    In response to Plaintiff's September 2024 dispute, Defendant failed to delete any of the 15 accounts disputed by Plaintiff.

148.    In response to Plaintiff's September 2024 dispute, Defendant failed to delete the 15 inquiries disputed by Plaintiff.

149.    In response to Plaintiff's September 2024 dispute, Defendant failed to delete the Chapter 7 Bankruptcy disputed by Plaintiff.

150.    Defendant failed to conduct a reasonable investigation of Plaintiff's September 2024 dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and remove or modify the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

151.    Thereafter, and upon information and belief, Defendant failed to unmix Plaintiff's credit file from that of her brother and Defendant continued to report her brother's consumer information to Plaintiff's consumer file.

152.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published

and maintained concerning Plaintiff.

**H.    Plaintiff Sustained Damages as a Result of Defendant Experian's Inaccurate Reporting**

153.    Upon information and belief, on or about February 23, 2025, in response to one or more further disputes by Plaintiff, Defendant finally removed much of the inaccurate and disputed information from Plaintiff's credit file.

154.    However, as a result of Defendant's conduct, Plaintiff had already sustained significant emotional distress. Specifically, Plaintiff has spent an inordinate amount of time dealing with the stress and anxiety caused by the false reporting from Defendant.

155.    Plaintiff's mind frequently drifted to thoughts of the issues with her Experian report, future potential issues caused by Experian, and/or other related matters.

156.    Plaintiff has spent hours trying to correct her Experian consumer file and suffered an enormous amount of stress associated with the inaccurate reporting.

157.    For a considerable period of time, until on or about February 23, 2025, Plaintiff was anxious and frustrated because she did not know how to correct her Experian report.

158.    For a considerable period of time, until on or about February 23, 2025, and as a result of the "mixed file," Defendant made it practically impossible for Plaintiff to obtain credit for a new vehicle.

159.    Plaintiff's inability to obtain credit for a new vehicle has resulted in significant hardships. She is forced to rely on her current vehicle, which is not only old and plagued with serious mechanical issues, but also embarrassingly loud. This situation causes her considerable distress and humiliation when driving. When her vehicle is unusable, she must resort to costly alternatives such as cabs, rental cars, or other means of transportation, leading to additional expenses and time constraints. The car's poor condition also increases her travel time. Although

she considered financing repairs, the inaccurate information in her Experian consumer report prevents her from doing so. This error, caused by Defendant mixing her identity with that of her twin brother, has led to the denial of at least one auto loan application. Consequently, Plaintiff has suffered unnecessary financial losses and time expenditures that could have been avoided if she had been able to acquire a reliable vehicle.

160.    At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

161.    At all times pertinent hereto, Defendant's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

162.    As a standard practice, Defendant does not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the furnishers, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

163.    Defendant is aware of the shortcomings of its procedures and intentionally chooses

not to comply with the FCRA to lower its costs. Accordingly, Defendant's violations of the FCRA are willful.

164.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anxiety, stress, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's consumer file.

### CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

165.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

166.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows: "Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates." 15 U.S.C. §1681e(b) (emphasis added).

167.    On at least one occasion, Defendant prepared patently false consumer reports concerning Plaintiff.

168.    Defendant mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

169.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

170.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anxiety, stress, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's consumer file.

171.    Defendant's conduct, actions, and inactions was willful, rendering Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

172.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

173.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

174.    The FCRA mandates that Defendant conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id.*

175.    The FCRA provides that if Defendant conducts its reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed information, it is required to delete the item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

176.    Plaintiff initiated a dispute with Defendant and disputed inaccurate information reporting in her credit file and requested that Defendant correct and/or delete the inaccurate, misleading, and highly damaging information belonging to an unrelated consumer.

177.    Defendant failed to respond to Plaintiff's dispute and conducted no investigation of Plaintiff's dispute, or such investigation, if any, was so unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

178.    Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the

30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's credit files.

179.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anxiety, stress, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's consumer file.

180.    Defendant's conduct, actions, and inactions was willful, rendering Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

181.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT III
### 15 U.S.C. § 1681b(a)
### Furnishing a Credit Report Without a Permissible Purpose

182.    Plaintiff re-alleges and incorporates by reference the allegations set forth in

preceding paragraphs as if fully stated herein.

183.    This action involves the willful, knowing, and/or negligent violation of the FCRA relating to the dissemination of consumer credit and other financial information.

184.    Plaintiff is a "consumer" as defined by the FCRA.

185.    Defendant is a consumer reporting agency that furnishes consumer reports as defined and contemplated by the FCRA.

186.    The FCRA prohibits any consumer reporting agency from furnishing a consumer report unless it has a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

187.    On multiple occasions, Defendant furnished Plaintiff's credit report to various entities without a permissible purpose in response to credit applications of another, which did not involve Plaintiff, and which Defendant therefore had no reason to believe that those various credit-issuing entities intended to use Plaintiff's credit information in connection with a credit transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

188.    Defendant violated 15 U.S.C. § 1681b(a) by selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer.

189.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and

trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anxiety, stress, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's consumer file.

190.    Defendant's conduct, actions, and inactions was willful, rendering Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

191.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a)    Determining that Defendant negligently and/or willfully violated the FCRA;

b)    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c)    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d)    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: April 3, 2025               **CONSUMER JUSTICE LAW FIRM**

By:    */s/ Levi Y. Eidelman*
Levi Y. Eidelman, NY Bar No. 5742499
72-47 139th Street
Flushing, New York 11367
T: (718) 360-0763
F: (480) 613-7733
E: leidelman@consumerjustice.com

*Attorneys for Plaintiff Robertha Saunders*